UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────────────

UNITED STATES OF AMERICA,
                              Plaintiff,


        -vs-                                    08-CV-850


NATIVE WHOLESALE SUPPLY CO.,
                              Defendant.
───────────────────────────────────────────


APPEARANCES:    UNITED STATES DEPARTMENT OF JUSTICE - CIVIL DIVISION
                (WENDY M. ERTMER DOTY, ESQ., OF COUNSEL), Washington,
                D.C., Attorneys for the United States of America and Secretary
                Vilsack.

                WINDELS MARX LANE & MITTENDORF (ROBERT J. LUDDY,
                ESQ., OF COUNSEL), New York, New York, Attorneys for Native
                Wholesale Supply Company.

                JAECKLE FLEISCHMANN & MUGEL, LLP, Buffalo, New York,
                Local Counsel for Native Wholesale Supply Company.


## INTRODUCTION

By order of United States District Judge Richard J. Arcara dated September 21,

2011 (Item 72), this case has been transferred to the undersigned for all further

proceedings.  Currently before the court are cross-motions of the parties for summary

judgment (Items 55, 56).

This case involves the interpretation of the Fair and Equitable Tobacco Reform Act

of 2004, codified at Title 7 U.S.C. § 518, *et seq.* ("FETRA").  As explained by the

government in its memorandum of law in support of its motion for summary judgment,

FETRA was enacted to facilitate the transition of the domestic tobacco market from a

subsidized and regulated market into a free market system (Item 55, p. 1).  The statute directs that, over a ten-year period, the Secretary of the Department of Agriculture is to make annual payments to tobacco farmers and producers as consideration for the termination of government quotas and price supports.  These payments are made from a Tobacco Trust Fund which is funded principally through quarterly assessments on all domestic manufacturers and importers of tobacco products over the ten-year program. The Secretary, through the Commodity Credit Corporation ("CCC"), imposes the assessments based on the manufacturer's or importer's market share of the gross domestic volume of tobacco products sold.  The market share is computed from documentation which the manufacturers and importers must provide to CCC pursuant to FETRA.  *Id.,* pp. 3-5.

In its motion for summary judgment, the government contends that Native Wholesale Supply Company ("NWS") has failed to pay its quarterly assessments as required by FETRA.  It seeks a money judgment in the amount of the delinquent assessments and injunctive relief directing that NWS provide the documentation required by the statute.  NWS has cross-moved for summary judgment, arguing that CCC has erroneously computed the amount of the assessment.  Additionally, it contends that the statute is unconstitutional on various grounds.

**BACKGROUND**

The United States, on behalf of the CCC of the Department of Agriculture ("USDA") commenced this action on November 21, 2008 (Item 1).  It alleged that CCC has notified Native Wholesale Supply Company ("NWS") of its quarterly assessments in accordance

2

with FETRA.  NWS has only partially paid its assessments for 2005, has failed to pay any part of its assessments for calendar years 2006, 2007, and 2008,[1] and has failed to submit the documentation required by the statute for the period January 2007 to the present.  In its complaint, the government seeks a monetary judgment in the amount of $18,451,475.96, plus any assessments, interest, and/or penalties that have accrued or will accrue during the pendency of this action.[2]  It also seeks injunctive relief compelling NWS to provide copies of the appropriate documentation required by FETRA.  On December 23, 2008, NWS filed its answer to the complaint, asserting that the government's claims pursuant to FETRA violate its treaty rights and right to due process, and is an unconstitutional taking (Item 3).

On January 9, 2009, the government filed a motion for summary judgment (Item 7). NWS filed its opposition to the motion (Item 13) on March 16, 2009 and, at the same time, commenced a separate action designated as 09-CV-241 ("the 2009 action").  On May 4, 2009, NWS filed a motion to consolidate the two actions (Item 24).

In the 2009 action, NWS challenges the assessments for the years 2005 through 2008.  It argues that the assessments are void and defective because they were computed using an improper "base period."  NWS also argues that the government, through its enforcement of FETRA, has violated the Takings and the Due Process Clauses of the Fifth

---

[1] Counsel for the government states that NWS has failed to pay or to administratively challenge any assessments since the commencement of this action.

[2] At the time of oral argument, on October 19, 2010, the government stated that the amount of unpaid assessments, interest, and penalties totaled approximately $36 million.

Amendment.  On May 26, 2009, the government filed a motion to dismiss the 2009 action or, in the alternative, to stay the proceedings (Item 8).

In a Decision and Order/Report and Recommendation dated October 20, 2009, Magistrate Judge H. Kenneth Schroeder granted the motion to consolidate the cases (Item 38).  He further recommended that the government's motion to dismiss the 2009 action should be denied, and that the government's motion for summary judgment in the original action be held in abeyance pending resolution of the issues raised in the 2009 action.  In an order dated March 26, 2010, the Hon. Richard J. Arcara adopted the Report and Recommendation (Item 43).

On August 27, 2010, the parties filed cross-motions for summary judgment (Items 55, 56).  Memoranda in opposition to the motions were filed by NWS (Item 65) and by the government (Item 66) on October 1, 2010.  The government filed a reply memorandum on October 15, 2010 (Item 68).  Oral argument was heard before Magistrate Judge Schroeder on October 19, 2010.  The case was transferred to the undersigned on September 21, 2011 (Item 72.  For the reasons that follow, the government's motion for summary judgment is granted, and the motion of NWS is denied.

**FACTS**

The facts of the case are largely undisputed.  NWS is a corporation chartered by the Sac and Fox Tribe of Oklahoma and maintains its office on the Seneca Cattaraugus Indian Territory in Gowanda, New York (Item 59, Exh. A, ¶ 2).  Its primary business is the sale of tobacco products.  *Id.,* ¶ 3.  Specifically, NWS imports cigarettes manufactured by Grand River Enterprises Six Nations, Ltd. ("Grand River") for resale to third parties.  Grand River

4

is wholly owned by Native Americans and produces, packages, and sells tobacco products on the Grand River Reserve in Canada.  *Id.*

In 2005, NWS began reporting its tobacco removal[3] information to CCC as required by FETRA.  It reported the removal of tobacco products into domestic commerce for the quarter beginning October 31, 2004 through the quarter ending September 30, 2008. Based on the removal reports, CCC assessed quarterly assessments from March 1, 2005 through December 1, 2008 (Item 59, Exh. B).

NWS timely filed a challenge to the 2005 assessments and requested an administrative hearing.  Its appeal of its assessments was consolidated with those of three other manufacturers and/or importers.  The parties raised several issues on appeal, including the contention that CCC used an improper "base period" to calculate the assessments (Item 59, Exh. C, p. 3). CCC issued its administrative determination on May 31, 2007 and rejected the argument regarding the "base period" (Item 59, Exh. C, pp. 4-5). Three other issues were resolved in favor of NWS, and CCC adjusted the assessments accordingly.  *Id.,* pp. 11-12.  Thereafter, the Secretary issued assessments for fiscal years 2006, 2007, and 2008.  NWS did not file formal challenges to those assessments, but its attorney stated that additional challenges were unnecessary "because a favorable decision on the appeal relating to 2005,  would require the Secretary to recalculate assessments for all subsequent years" (Item 59, Exh. D, ¶ 2.

Arthur Montour, the President and owner of NWS, stated that it is his understanding "that NWS has filed with the Government all of the documents that are required pursuant

---

[3]  "Removal" for purposes of FETRA is the removal of tobacco products from the factory or release from customs custody.  26 U.S.C. § 5702(j).

to FETRA" (Item 59, Exh. A, ¶ 5).  In support of its motion for summary judgment, NWS has submitted U.S. Customs and Border Protection ("CBP") forms that indicate that cigarettes were imported by an entity known as Livingston International, Inc., with NWS listed as the "Ultimate Consignee" (Item 59, Exhs. I, J, K, L, M).  The Government has submitted the Administrative Record from the NWS appeal of the 2005 assessments, which includes the forms submitted by NWS pursuant to FETRA to compute its market share.  The forms include a CCC form entitled "Report of Tobacco Product Removals Subject to Tax for the Tobacco Transition Payment Program Assessment" ("Removal Report"), a form from the Alcohol and Tobacco Tax and Trade Bureau ("TTB") entitled "Monthly Report–Tobacco Products Importer," and the CBP form entitled "Entry Summary" (Item 52).[4]

## DISCUSSION

NWS challenges its assessments on several grounds, primarily the agency's interpretation of FETRA.  It also argues that FETRA violates the Takings and Due Process Clauses of the Constitution and certain Native American treaty rights.  Finally, NWS argues that it was erroneously assessed for the importation of cigarettes by Livingston International, Inc., a customs broker.  Each challenge will be addressed in turn.

---

[4]  References to the Administrative Record are preceded by "AR."

**1.  Summary Judgment Standard**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." *Addickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

However, a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment.  *Anderson,* 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), it must "offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911 (1998).  That is, there must be evidence from which the jury could reasonably find for the nonmoving party.  *Anderson,* 477 U.S. at 252.

## 2.  Interpretation of FETRA

The primary issue in this case is the USDA's interpretation of FETRA with regard to the imposition of quarterly assessments.  NWS contends that CCC has computed its quarterly assessments using an incorrect "base period."   The government has acknowledged an apparent ambiguity in the statute, but states that the USDA has promulgated regulations and computed the assessments in a reasonable manner.  Accordingly, the government contends that the agency determination must be accorded due deference.

A review of the provisions of FETRA is instructive.  FETRA is a ten-year transitional program under which the USDA makes payments to tobacco farmers formerly assisted by marketing quotas.  7 U.S.C. § 518e.  The payments are made from the Tobacco Trust Fund ("TTF") of the Commodity Credit Corporation at USDA. *Id.* § 518e(a). The TTF is supported by quarterly assessments on tobacco manufacturers and importers. *Id.* § 518d(b).  Under FETRA, assessments are allocated among manufacturers and importers of six types of tobacco products: cigarettes, cigars, snuff, roll-your-own, chewing, and pipe. *Id*. § 518d(c). The allocation within each class of tobacco product "shall be . . . on a pro rata basis . . . based on each manufacturer's or importer's share of gross domestic volume," with "[n]o manufacturer or importer . . . required to pay an assessment that is based on a share that is in excess of [its] share of domestic volume." *Id.* § 518d(e)(1), (2). An individual manufacturer's or importer's assessment within a class of tobacco product is determined by multiplying its market share of the tobacco class by the total amount of the assessment for the tobacco class. *Id.* § 518d(f).

8

Congress established the class allocations for fiscal year 2005, *see* 7 U.S.C. § 518d(c)(1), while authorizing the Secretary of Agriculture to adjust the allocations in subsequent years "to reflect changes in the share of gross domestic volume held by that class of tobacco product." *Id*. § 518d(c)(2).  Gross domestic volume is defined as "the volume of tobacco products removed (as defined by section 5702 of Title 26)" and "not exempt from tax under chapter 52 of Title 26 . . . ." *Id*. § 518d(a)(2).  "[R]emoved," as used by FETRA, means "the removal of tobacco products or cigarette papers or tubes, or any processed tobacco, from the factory . . . or release from customs custody . . . ." 26 U.S.C. § 5702(j).

As interpreted by USDA, FETRA creates a two-step process for determining the amount of each manufacturer's or importer's quarterly assessment.  First, assessments are allocated among the six classes of tobacco.  7 U.S.C. § 518d(c); 7 C.F.R. § 1463.5.  For fiscal year 2005, Congress apportioned 96.331% of the total assessment to the cigarette class. 7 U.S.C. § 518d(c)(1)(A).  Next, USDA allocates each class's share among individual manufacturers and importers based on market share, which turns on the "volume of domestic sales."  *See id*. § 518d(f), (a)(3).  USDA obtains the data needed for these calculations from copies of TTB and CBP forms listing the number of cigarettes and cigars and numbers of pounds of other tobacco products "removed" into domestic commerce that are submitted to USDA by manufacturers and importers. See 7 U.S.C. § 518d(h)(1), (2); 7 C.F.R. § 1463.7(b).  A manufacturer or importer may appeal its assessment to the Secretary, using "any information that is available, including third party data on industry or individual company sales volumes," and the Secretary must "make any revisions necessary

to ensure that each manufacturer and importer pays only its correct pro rata share of total gross domestic volume from all sources." *Id.* § 518d(i)(2), (i)(4)(B).

NWS has taken issue with the computation of the assessments because, it argues, CCC has used an improper "base period" to calculate its market share.

FETRA provides that assessments for each program year shall apply to "each tobacco product manufacturer and tobacco product importer that sells tobacco products in domestic commerce in the United States during that fiscal year." 7 U.S.C. § 518d(b)(1). According to FETRA, "market share" is "the share of each manufacturer or importer of a class of tobacco product . . . of the total volume of domestic sales of the class of tobacco product during the base period for a fiscal year for an assessment under this section." 7 U.S.C. § 518d(a)(3). "The "base period" is defined as "the one-year period ending the June 30 before the beginning of a fiscal year." 7 U.S.C. § 518d(a)(1). FETRA goes on to provide that "[a]ssessments shall be collected at the end of each calendar year quarter. . . ." 7 U.S.C. § 518d(d)(3)(A). The amount of the assessment to be paid by each individual manufacturer or importer "shall be determined for each quarterly payment period by multiplying . . . the market share of the manufacturer or importer, as calculated for that payment period" by the total amount of the class assessment. 7 U.S.C. § 518d(f). Finally, the statute provides that "[t]he assessment for a calendar year quarter shall correspond to the base period quarter that ended at the end of the preceding calendar year quarter." 7 U.S.C. § 518d(d)(3)(B).

NWS asserts that CCC must refer back to the base period to determine the appropriate quarter upon which to compute the assessment. Essentially, it argues that each quarterly assessment should be based on the market share from the previous

calendar year quarter in the base period, which would commence approximately 18 months prior to the assessment date.  Thus, for assessments in fiscal year 2010, according to the statute, the base period is the period from July 1, 2008 to June 30, 2009, prior to the start of fiscal year 2010.  The first quarterly assessment in 2010 would have been due on March 31, 2010.  As the court understands its argument, NWS contends that the assessment should have corresponded to the calendar year quarter from October 1, 2008 to December 31, 2008.  Similarly, the June 30, 2010 assessment should have corresponded to the calendar year quarter January 1, 2009 to March 31, 2009.

When the USDA promulgated rules to administer FETRA, it stated that the statute "contains several provisions that give contradictory direction to CCC."  (Item 59, Exh. R, p. 3).  It noted the definition of the base period and stated that for fiscal year 2005, the base period would be July 1, 2003 through June 30, 2004 "and an entity's market share would be its share of the sale of tobacco products from July 1, 2003 through June 30, 2004." (*Id.*, p. 2).  It then noted that section 518d(f) "provides that the determination of the amount of a quarterly assessment owed by an entity will be based on its prior quarterly period sales."  *Id.*  Section 518d(f) states that the amount of the assessment for each class shall be determined by multiplying the market share of the manufacturer or importer by "the total amount of the assessment for that quarterly payment period . . . ."  Accordingly, the agency reasoned that the first payment, due on March 31, 2005, would be "determined by using the October 1, 2004 through December 31, 2004 market share of the entity within each of the six product sectors."  (Item 59, Exh. R, p. 2)*.*  It concluded that the terms "market share" and "base period" were "effectively limited to being used to determine the division of the national assessment among the six previously listed sectors."  *Id.*

11

The agency also noted section 518d(d)(3)(B), which requires the assessment for a calendar year quarter to "correspond to the base period quarter that ended at the end of the preceding calendar year quarter."  CCC stated that this section "runs counter to the use of the 'market share' and 'base period' provisions" of FETRA. (Item 59, Exh. R, p. 3). Accordingly, CCC interpreted section 518d(d)(3)(B) "to mean that an entity's required payment is to be adjusted quarterly by determining an entity's share of a tobacco product sector based upon the prior 3 month marketings of the entity."  *Id.*

In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), the Supreme Court established a two-step framework for courts reviewing an administrative agency's interpretation of a statute.  First, the court must consider "whether Congress has directly spoken to the precise question at issue." *Id.,* p. 842.  If the statute is unambiguous, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id*. at 842–43, 104. If, however, the statute is "silent or ambiguous with respect to the specific issue," the court must then examine whether the agency's determination is "based on a permissible construction of the statute," and, if so, must defer to the agency's interpretation (at least if it relates to a matter within the agency's expertise).  *Id.* at 843.  A court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11.  Rather, a court will defer to the agency's interpretation as long as that interpretation is "'reasonable.'" *Cohen*

*v. JP Morgan Chase & Co.,* 498 F.3d 111, 116 (2d Cir. 2007) (quoting *Chevron*, 467 U.S. at 844).

Obviously, this statute is not a model of clarity.  While the definitions of "market share" and "base period" are unambiguous, the application of those definitions to the remainder of the statute is murky.  Section 518d(d)(3)(B) is particularly troublesome. Having defined the "base period" as a twelve-month period ending on the June 30 prior to the start of a fiscal year and "market share" as the share of each manufacturer or importer "during the base period for a fiscal year," the statutory waters are muddied by the direction that the assessments "correspond to the base period quarter that ended at the end of the preceding calendar year quarter."  First, it is unclear what Congress meant by directing that assessments "correspond" to a particular quarter.  Presumably, it was intended that the assessment be calculated based on the market share of that particular quarter, but it is not explicit.  Additionally, it is unclear what is meant by the "base period quarter that ended at the end of the preceding calendar year quarter."  The preceding calendar year quarter would not be part of the statutorily defined base period, and a calendar year quarter from the base period would not end at the end of the preceding calendar year quarter before the assessment date.  Section 518d(f) provides that market share for individual manufacturers and importers is computed "for each quarterly payment period " based on the market share "as calculated with respect to that payment period . . . ."  While NWS maintains that its market share should have been computed with respect to market data from 15 to 18 months earlier, it is equally plausible that Congress intended the market share to be based on current market data from the previous calendar year quarter and that the "base period" was to be used to compute market share of the entire class.  In any event, there is no

indication that CCC's administration of the statute results in an assessment to NWS or any other manufacturer or importer that is in excess of its "pro rata share of total gross domestic volume," 7 U.S.C. § 518d(i)(4)(B), or that is significantly different than the assessment that would result from the use of earlier data.  NWS's contention that older data would result in a more accurate computation of market share is unavailing, as the assessments are based on contemporaneously filed documents in each fiscal year.  An entity's tobacco "removals" would not change with the passage of time.  Additionally, over the ten-year period of the FETRA program, manufacturers and importers will eventually be assessed using the same quarterly market data.  For fiscal year 2005, CCC apparently based its calculations on 2004-2005 data.  Under NWS's method of computation, it would eventually be assessed based on that same data, but not until 2006, one year later.

CCC's interpretation is reasonable and results in assessments based on current market data.  This is consistent with the statutory provision that requires assessments "on each tobacco product manufacturer and tobacco product importer that sells tobacco products in domestic commerce in the United States during that fiscal year."  7 U.S.C. § 518d(b)(1).  Accordingly, the agency's interpretation of FETRA with regard to the calculation of assessments is entitled to deference.

### 3.  The Due Process and Takings Clauses

In its motion for summary judgment, NWS asserts that FETRA violates both the Takings and Due Process Clauses of the Fifth Amendment to the United States Constitution.  Both of these issues were examined in *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046 (11th Cir. 2008), *cert. denied,* 130 S. Ct. 71 (2009), and the Eleventh Circuit Court of

Appeals determined that FETRA passes constitutional muster.  The parties in *Swisher* primarily relied on the Supreme Court case *Eastern Enterprises v. Apfel,* 524 U.S. 498 (1998), a challenge to the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), as does NWS on this motion.  The Coal Act assigned retirees to previous employers according to a statutory formula, requiring the employers to pay premiums into a combined fund to cover benefits for the retirees.  Justice O'Connor, writing for a four-member plurality, applied the Takings Clause and found that the Coal Act constituted a taking.  Specifically, she found that the Coal Act placed a significant financial burden on the plaintiff, interfered with its investor-backed expectations, and constituted "unusual" government action. *Eastern Enterprises,* 524 U.S. at 529-36.  Justice Kennedy concurred in the judgment, but based his determination on the Due Process Clause, finding that the unprecedented scope of retroactivity was a significant determinant of unconstitutionality. *Id.,* at 549.  The four dissenters agreed with Justice Kennedy that the Takings Clause was not applicable.  *Id.,* at 554.

The *Swisher* court concluded that neither the O'Connor nor the Kennedy opinion in *Eastern Enterprises* constituted binding authority as neither rationale could be meaningfully regarded as "narrower" than the other.  *Swisher,* 550 F.3d at 1054 (citing *Marks v. United States,* 430 U.S. 188 (1977) (in fragmented decision, holding of the Court may be viewed as the position taken by those justices who concurred in the judgment on the narrowest ground)).  Its independent evaluation of the applicable case law led the *Swisher* court to the conclusion that "the takings analysis is not an appropriate analysis for the constitutional evaluation of an obligation imposed by Congress merely to pay money."

*Swisher,* 550 F.3d at 1054.  The *Swisher* court found that the obligation to pay quarterly assessments under FETRA "does not operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest."  *Swisher,* 550 F.3f at 1055 (quoting *Eastern Enterprises,* 524 U.S. at 540).

Turning to the plaintiff's due process challenge, the *Swisher* court stated that "[e]conomic legislation 'come[s] to the Court with a presumption of constitutionality.'" *Swisher,* 550 F.3d at 1057 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976)).  "[I]f the government can show that the statute has a 'legitimate legislative purpose furthered by rational means,' due process is satisfied."  *Id.* (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992)).

The *Swisher* court found that the obligation under FETRA, unlike that imposed by the Coal Act, did not impose a retroactive obligation on a manufacturer or importer of tobacco products.  *Swisher,* 550 F.3d at 1058.  "Under the plain meaning of the language of the statute, every tobacco manufacturer and importer currently participating in the domestic tobacco market is subject to the assessments. Accordingly, a new manufacturer or importer would be subject to an assessment under the statute as a cost of doing business in the industry."  *Id.*  Additionally, the court found that the legitimate legislative purpose was apparent and furthered by rational means.  Congress recognized that a

> transition to a free market system would benefit all current and future
> tobacco manufacturers and importers, and thus devised a system of
> assessments to fund the transition to the free market system-i.e., assessing
> all current tobacco manufacturers and importers, all of whom would benefit
> from the transition to the free market system.  Moreover, tobacco
> manufacturers and importers currently engaged in the domestic market are
> entities that are not only likely to benefit from the deregulation, but also are

16

entities best suited to pass such increased costs along to the ultimate consumers.

*Swisher,* 550 F.3d at 1058-59.

This court finds the *Swisher* analysis well-reasoned and persuasive. A review of the statute under the Takings Clause is not appropriate, and FETRA is not inconsistent with the Due Process Clause. *See also United States v. Leader Tobacco Co.,* 2010 WL 3701581 (S.D. Fla. September 15, 2010) (FETRA does not violate due process); *United States v. American Automotive Sec. Prods., Inc.,* 2009 WL 689716, *1 (S.D.Fla. March 16, 2009) (same). Even if the court were to apply a regulatory takings analysis, it would find that FETRA withstands such scrutiny.

Under a regulatory takings analysis, in order to determine whether the interference with property rises to the level of a taking, the court must consider: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006), *cert. denied,* 550 U.S. 918 (2007) (quoting *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 224-25 (1986)). Here, while the amount of the delinquent assessment is substantial, the government notes that NWS has been assessed, on average, less than three-tenths of a cent per cigarette, or less than a nickel per pack, a cost which NWS could easily pass on to its customers. Additionally, FETRA imposes the assessments based on current economic activity and does not impose retroactive obligations. It is irrelevant that NWS did not benefit from the previous system of price supports and subsidies. It is an importer of tobacco products that is likely to benefit in the long-term from the free market

system.  Finally, the statute serves a legitimate government purpose, easing the transition

from a regulated to a free and unsubsidized domestic tobacco market.  For these reasons,

the court finds that FETRA does not violate either the Takings Clause or the Due Process

Clause of the Fifth Amendment.

**4.  The Treaties**

The government notes that NWS, in its answer, stated that FETRA does not apply

to it because it is a Native American-owned corporation.  However, a federal statute of

general applicability that is silent on the issue of applicability to Native Americans will apply

to them unless "(1) the law touches 'exclusive rights of self-governance in purely intramural

matters'; (2) the application of the law to the tribe would 'abrogate rights guaranteed by

Indian treaties'; or (3) there is proof 'by legislative history or some other means that

Congress intended [the law] not to apply to Indians on their reservations.'"  *U.S. v. White*,

237 F.3d 170, 173 (2d Cir. 2001) (quoting *Reich v. Mashantucket Sand & Gravel,* 95 F.3d

174, 177 (2d Cir. 1996)).  FETRA does not implicate "purely intramural" matters of self-

governance and the legislative history contains no indication that Congress intended Native

Americans to be exempt from FETRA.

Turning to its treaty arguments, NWS bases its affirmative defense on the so-called

duty exemption of Article III of the Treaty of Amity, Commerce and Navigation, commonly

known as the "Jay Treaty", and the Treaty of Ghent.  The duty exemption of the Jay Treaty

reads as follows:

> No Duty of Entry shall ever be levied by either Party on Peltries brought by
> Land, or Inland Navigation into the said Territories respectively, or shall the
> Indians passing or repassing with their own proper Goods and Effects of

whatever nature, pay for the same any Impost or Duty whatever, But Goods in Bales, or other large Packages unusual among Indians shall not be considered as Goods belonging bona fide to Indians.

8 Stat. 116, 188 (1794).  At the conclusion of the War of 1812, the United States and Great Britain entered into the Treaty of Ghent in 1815.  The Ninth Article of the Treaty of Ghent provides that both nations would restore to any Indians with whom each was at war "all the possessions, rights and privileges which they may have enjoyed or been entitled to" before the war.  8 Stat. 218 (1815).

Courts that have examined the two treaties have concluded that the duty exemption to the Jay Treaty was abrogated by the War of 1812 and the Tariff Act of 1897 and not revived by the Treaty of Ghent.  *See United States v. Boots,* 80 F.3d 580, 585 n.7 (1st Cir. 1996), *overruled on other rounds by Pasquantino v. United States,* 544 U.S. 349 (2005); *Akins v. United States,* 551 F.2d 1222, 1229-30 (C.C.P.A. 1977); *United States v. Garrow,* 88 F.2d 318, 323-24 (C.C.P.A.), *cert. denied,* 302 U.S. 695 (1937); *United States v. Miller,* 26 F.Supp.2d 415, 429 (N.D.N.Y. 1998).  Additionally, the Tax Court in *Lazore v. Commissioner,* 1992 WL 163978 (T.C. 1992), *aff'd in relevant part and rev'd in part,* 11 F.3d 1180 (3d Cir. 1993) found that the duty exemption "does not exempt goods carried by the Iroquois where the apparent purpose is for trading in commerce."

Here, the importation of cigarettes by NWS is for commercial purposes.  Even if the court were to conclude that the duty exemption of the Jay Treaty was revived by the Treaty of the Ghent, the duty exemption would not apply to the importation of cigarettes for commercial sale.  Accordingly, the court finds that FETRA does not violate rights under the Jay Treaty and the Treaty of Ghent.   Moreover, Native American importers or

manufacturers of tobacco products are not exempt from FETRA and its assessment obligations.

## 5. The "Livingston" Challenge

Finally, NWS argues that it has been overcharged in its assessments in that CCC imposed approximately $9 million of assessments corresponding to approximately 25 million cartons of cigarettes allegedly imported by another company.  NWS's BCP forms, submitted in response to the motion for summary judgment, indicate that millions of cigarettes were imported by Livingston International, Inc., with NWS listed on the form as the "Ultimate Consignee."  According to its website, Livingston International, Inc. is "North America's customs and compliance expert."  Its "core customs clearance services" include "Customs release of goods, prima facie classification and filing of your entries with U.S. Customs and Border Protection" and   "Determination of duties and taxes owed and facilitation of your payments to the U.S. government."[5]

The government notes and NWS concedes that it did not raise this issue at its administrative appeal of its 2005 assessments.  Under FETRA, an assessed entity may challenge any assessment administratively by notifying the Secretary, not later than 30 business days after receiving the assessment notification, and specifying the basis of the dispute.  7 U.S.C. § 518d(i)(1).  Furthermore, any importer or manufacturer aggrieved by a determination of the Secretary with regard to the amount of an assessment may seek

---

[5] Livingston International, available at http://www.livingstonintl.com (last visited September 7, 2011).

judicial review in federal district court following the exhaustion of administrative remedies. *Id.,* §518d(j)(1).

NWS argues that administrative exhaustion of the so-called "Livingston" challenge was not required, as it a general challenge that would not have been administratively appealable. It states that determination of the "issue of whether ultimate consignees are included within the statute's class of persons" would affect all consignees in the same position, not just NWS (Item 65-2, p. 12). In the court's view, this challenge is to the amount of the assessment, as NWS now alleges that it has been assessed for the importations of Livingston. It is exactly the type of challenge that should have been raised at the agency level. As such, NWS has waived this challenge for its failure to exhaust.

In any event, the argument regarding exhaustion is irrelevant. Regardless of whether exhaustion was required, the Livingston challenge is without merit. FETRA provides that assessments for each program year shall apply to "each tobacco product manufacturer and tobacco product importer that sells tobacco products in domestic commerce in the United States during that fiscal year." 7 U.S.C. § 518d(b)(1). Livingston International is not an importer that sells cigarettes or other tobacco products. It is a customs broker that, holding a license under Title 19 U.S.C. § 1641, assists entities bringing commodities into the United States. A customs broker, when designated by the owner, purchaser or consignee of the goods, is the "importer of record" and is authorized to file the documentation to enable the Customs Service to assess duty on the merchandise, collect statistics, and determine whether any other applicable requirement of law has been met. 19 U.S.C. §§ 1484(a)(1), (a)(2)(B). Even though Livingston is listed on the CBP forms as the importer of record, it declared at the bottom of the entry summary

form that NWS is the "actual purchaser, owner, or consignee for customs purposes."  NWS

is the ultimate consignee of the cigarettes, sells the cigarettes, reports the "removal" of

those cigarettes, and is the entity responsible for the payment of the assessment.  For

purposes of FETRA, NWS is the "importer" of the cigarettes, not Livingston International.


Additionally, the court has reviewed the documents submitted to the agency as part

of the administrative record.  NWS was required to furnish summary reports of its tobacco

removals so as to allow for the computation of the assessments.  The record indicates that

NWS was assessed based on its own self-reported removals, including those removals

which it now claims were made by Livingston.  Accordingly, the assessments are supported

by the information provided by NWS to the Secretary.

## CONCLUSION

Based on the foregoing, the government's motion for summary judgment is granted,

and the motion of NWS is denied.  NWS is directed to forthwith provide the government

with all pertinent documents required by FETRA.  Before a money judgment can be

entered, however, the government is instructed to file with the court an affidavit with

supporting documentation specifying a final accounting of the delinquent assessments to

date, with any penalties and interest owed by NWS.  Such documents shall be filed within

thirty days of the filing of this decision.  Thereafter, judgment shall be entered for the

government.

So ordered.

_____\s\ John T. Curtin ___
JOHN T. CURTIN
United States District Judge

Dated: October 3               , 2011
p:\opinions\08-850